**Herschel SKINNER, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

**Billy GRIFFIETH, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

**James MADDEN, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

Nos. 92–SC–216–MR, 92–SC–394–TG, 92–SC–395–TG.

Supreme Court of Kentucky.

Oct. 28, 1993.

Paul J. Neel, Jr., Appellate Public Advocate, Louisville, for appellants.

Chris Gorman, Atty. Gen., Vickie L. Wise, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

COMBS, Justice.

Herschel Skinner, Billy Joe Griffieth and James Madden were tried jointly and convicted on various charges involving a residential burglary. Skinner was convicted of burglary in the first degree, for which he was sentenced to fifteen years; wanton endangerment in the first degree, for which he was sentenced to five years; and as a persistent felony offender in the second degree, for which his sentences were enhanced to thirty and ten years, respectively. He appeals to this Court as a matter of right. Griffieth was convicted of burglary in the second degree and sentenced to five years; Madden was convicted of burglary in the second degree by complicity and sentenced to ten years; their appeals to the Court of Appeals were transferred to be heard and considered with Skinner's appeal.

There was evidence that on July 4, 1991, the three appellants, along with one Nathan Hale, decided to burglarize the Layton residence while the Laytons were at work. Occupying a green station wagon, the four first drove to the Laytons' place of employment and ascertained that both their vehicles were there. The men then drove to the Laytons' neighborhood, where they inquired of several neighbors as to the Laytons' whereabouts and the exact location of their home. Skinner and Hale alit from the car and entered the house, where they collected various valuables which they eventually loaded into a wheelbarrow. Madden and Griffieth drove away, Griffieth later returning to the house on foot and Madden driving to a pre-arranged meeting point beyond a meadow behind the house. Hale, Skinner and Griffieth began crossing the meadow with the laden wheelbarrow.

In the meantime, suspicious neighbors had alerted the Laytons and the police. One neighbor, Owen Golden, armed himself, approached the three men, and ordered them to stop. Golden and Skinner exchanged gunfire, each firing two or three shots. The intruders fled, abandoning the wheelbarrow.

Police found Madden driving the green station wagon in the vicinity, and arrested him. Madden volunteered a statement implicating his companions. Hale, who had been recognized by Golden, was also subsequently arrested and gave a statement. As part of a plea bargain, Hale testified for the Commonwealth at trial.

### A. No. 92–SC–216–MR

Skinner raises six issues on appeal: 1) whether the trial court denied him due process in not accepting or enforcing a purported plea agreement; 2) whether the trial court erred to Skinner's substantial prejudice in denying his motion for separate trial; 3) whether the trial court erred in admitting into evidence a statement of Skinner's in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); 4) whether the trial court erred in not granting Skinner's motion for mistrial based on an inconsistent jury verdict; 5) whether the trial court erred in not granting Skinner's motion for directed verdict on the charge of attempted murder; and 6) whether the trial court erred in overruling an objection to alleged prosecutorial misconduct during the sentencing phase of trial.

On the day of trial—February 10, 1992—counsel informed the court that Skinner wished to accept a plea bargain offered by the Commonwealth in October 1991, whereunder, in exchange for a plea of guilty, the Commonwealth would recommend sentences of ten years for burglary and ten years for attempted murder, and dismissal of the PFO charge. The Commonwealth countered that those terms had been part of a joint offer extended to all defendants and conditioned upon acceptance by them all. Since some defendants had rejected the offer, the Commonwealth considered it withdrawn. Moreover, only a few days before trial, the Commonwealth had reached a sepa-

rate agreement with defendant Hale, indicating that the prior offer was no longer open. The trial court concluded that there was no bargain; it expressed a willingness to accept a plea on any charge contained in the indictment, but no willingness to amend or dismiss any charge. The trial court did, we note, accept Hale's plea to a charge of second-degree burglary (amended from first-degree).

According to RCr 8.08, the court "may refuse to accept a plea of guilty." The discretion of the trial court exists whether the proposed guilty plea is offered with or without consideration in the form of a plea agreement. In view of that discretion, we are unable to conclude that Skinner could have reasonably relied on the purported agreement to the point of neglecting his defense in the event of rejection. Furthermore, the trial court was justified in believing that the offer was conditioned upon unanimous acceptance by all defendants, some of whom had consistently rejected the offer. We are not persuaded by Skinner's citations to *Workman v. Commonwealth*, Ky., 580 S.W.2d 206 (1979) and *Colbert v. Commonwealth*, Ky., 306 S.W.2d 825 (1957) (both of which rulings with respect to polygraph evidence were overruled in *Morton v. Commonwealth*, Ky., 817 S.W.2d 218 (1991)). In *Workman*, the Commonwealth had agreed to dismiss the indictment if Workman submitted to and passed a polygraph examination administered by the Kentucky State Police. Workman apparently took and passed three examinations, at least one of which was requested by the Commonwealth's Attorney and conducted by the State Police. Workman moved the trial court to enforce the bargain and dismiss the indictment, providing affidavits and test results. The Commonwealth made no response, yet the court denied the motion without explanation. On appeal, it was observed that the record "disclosed no rational basis which would relieve the attorney for the Commonwealth from the performance of his bargain or justify the refusal of the trial judge to grant the motion to dismiss." *Id.*, 580 S.W.2d at 207. *Colbert, supra,* held polygraph results inadmissible over objection, absent the defendant's stipulation. In the present case, there appears

ample rational basis both to question the existence of an agreement, and to justify the trial court's refusal to accept a guilty plea conditioned on dismissal of the PFO indictment (which dismissal is itself subject to the court's discretionary approval—RCr 9.64). We perceive no abuse of discretion.

Skinner's second argument is that the trial court abused its discretion in overruling his motion for a separate trial. He maintains that: a) facing the most serious charges and the most severe penalties, he was prejudiced by evidence of his co-defendants' misdeeds; b) Griffieth and Madden, who did not testify, might have in a separate trial given testimony favorable to Skinner; c) before Hale's decision to plead and testify, the Commonwealth had intended to use his and Madden's confessions (with references to Skinner redacted), the "existence" of which confessions required a separate trial.

RCr 9.16 requires the trial court to grant severance if it appears that a defendant will be prejudiced by a joint trial. a) A generalized concern for the taint of co-defendants' relevant misdeeds, if sufficient to require severance, would essentially prohibit joint trials; b) the assertion that Griffieth and Madden "might have" given testimony favorable to Skinner in a separate trial is purest speculation; c) the statements of Hale and Madden, had they been used at all, would have been admissible in a joint trial if properly redacted. Skinner does not demonstrate either that prejudice was apparent to the trial court, or that the court abused its discretion in denying his motion for severance. *See Humphrey v. Commonwealth*, Ky., 836 S.W.2d 865 (1992); *Commonwealth v. Rogers*, Ky., 698 S.W.2d 839 (1985); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The case of *Lowe v. Commonwealth*, Ky., 487 S.W.2d 935 (1972), cited by the appellant, is readily distinguishable. There, reversible error was found in the admission into evidence of the unredacted statement of a non-testifying co-defendant saying that Lowe was "in on" the crime.

Skinner's third contention is that the trial court erroneously overruled his motion

to suppress testimony by police officers concerning incriminating statements allegedly made by Skinner after he had invoked his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the suppression hearing, one officer testified that he ceased questioning Skinner upon invocation of the right to an attorney, but that shortly thereafter Skinner initiated further conversation about the burglary, and volunteered statements, not in response to questioning.

A second officer, who was assigned to help transport Skinner about a month later, testified that, although informed of his rights and reminded that his attorney had advised him not to talk to police, Skinner nevertheless initiated conversation, made self-incriminating statements, and attempted to strike a bargain. At the conclusion of the suppression hearing, the trial court ruled that the statements were voluntarily given and not made in response to police questioning, and overruled the motion to suppress.

█ Once he has invoked his right to consult with counsel before further interrogation, an accused

> is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversation with the police.* [Emphasis added.]

*Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378, 386 (1981). Considering all the circumstances, the evidence amply demonstrates that the trial court was warranted in overruling the motion to suppress on grounds that Skinner fully understood his right to counsel and intelligently and knowingly relinquished it, and volunteered statements not in response to interrogation.

█ Appellant's fourth issue is whether he was entitled to a mistrial or other relief based upon inconsistent jury verdicts. Skinner was convicted of burglary in the *first* degree, while his co-defendants were found guilty of burglary in the *second* degree. The distinguishing element of first-degree burglary is the requirement that, "when effecting entry or while in the building or in the immediate flight therefrom [the defendant] *or another participant in the crime*" is armed with a deadly weapon, causes physical injury, or uses or threatens to use a dangerous instrument. KRS 511.020 (emphasis added). The gist of the argument, as we perceive it, is that, in finding Madden and Griffieth guilty of second-degree offenses, the jury necessarily determined that neither of them, *nor any participant in the crime,* was armed with a deadly weapon, etc., wherefore no defendant could be convicted of burglary in the first degree.

The only authority cited by the appellant in support of his claim of error is *Pace v. Commonwealth*, Ky., 636 S.W.2d 887 (1982). The charges against Pace arose when he drove his automobile into three pedestrians walking together beside the road. All the victims were struck virtually simultaneously, and there was nothing to distinguish one victim's position from that of another. It was said in *Pace* that the driver could not have acted wantonly with regard to two of the victims and only recklessly with regard to the third. *Pace* treats the question of inconsistencies among multiple verdicts against a single defendant (who could have had but one culpable state of mind in the circumstances); it does not treat the issue of possible inconsistencies among the verdicts returned against joint defendants (whose actions were not necessarily identical), and is not dispositive in the instant case.

What is dispositive, we believe, is that the verdicts here were *not* inconsistent under the instructions. A separate instruction on first-degree burglary was given as to each defendant. For conviction, the jury was required to find in each case that the defendant himself was armed with a deadly weapon, *not* that any participant in the crime was so armed. The instruction on first-degree burglary by complicity required for conviction that the defendant *intended* that another defendant would commit *first-degree* burglary. It was therefore quite consistent for the jury to find that Skinner was armed with a deadly weapon and therefore guilty of burglary in the first degree, while the co-defendants were unarmed (and unaware that Skinner

was armed) and therefore guilty of burglary in the second degree. These portions of the instructions were not challenged at trial and have not been challenged on appeal. Skinner has failed to establish his premise that the verdicts were inconsistent.

■ Appellant's fifth contention is that he was entitled to a directed verdict on the charge of attempted murder (which grew out of the shooting incident). Because Skinner was not convicted of attempted murder, but of the lesser offense of wanton endangerment in the first degree, it is difficult to perceive concrete prejudice to his substantial rights, even if the trial court erred in denying the motion for directed verdict on the greater offense. But in any event we believe that the trial court did not err. The core of the present issue is whether there was sufficient evidence to support a finding beyond reasonable doubt that Skinner intended to kill Golden, the Layton's neighbor with whom Skinner exchanged gunfire. There was evidence that Skinner pointed a gun at Golden and fired as many as three shots. Golden testified that he heard one bullet pass near his ear. There was further evidence that Skinner had committed a felony and was confronted by Golden while in immediate flight therefrom. Viewing the evidence and its reasonable inferences in favor of the Commonwealth, we hold that a reasonable juror might have believed beyond reasonable doubt that Skinner indeed had intended to kill Golden and was guilty of criminal attempt to commit murder. See Commonwealth v. Benham, Ky., 816 S.W.2d 186 (1991).

■ Lastly, Skinner maintains that the prosecutor misled the jury during argument in the penalty phase, and that the trial court erred in overruling the defendant's objection, and compounded the error by refusing to permit defense counsel to argue the objection. The Commonwealth had introduced into evidence parole eligibility guidelines from the Corrections Cabinet. These guidelines indicated that a defendant sentenced to life imprisonment must ordinarily serve eight years before becoming eligible for parole. In urging the jury to impose a severe sentence against Skinner, the prosecutor stated, "I don't know that a life sentence is necessarily

appropriate, but when you look at the parole guidelines and see that life equals eight years...."

We first observe that the appellant does not make issue of the admissibility of the parole eligibility guidelines. Second, the guidelines referred to by the prosecutor, and available to the jury as an exhibit, are clearly *eligibility* guidelines; we do not believe that the prosecutor's remark induced the jury to believe that a defendant sentenced to life would in fact be paroled after eight years. Third, the jury fixed Skinner's sentences at thirty years and ten years, not life. Fourth, the defense objection preserved the issue for appeal, and has now been argued. We find no substantial undue prejudice to the defendant.

The final judgment and sentence of imprisonment of the Madison Circuit Court is affirmed.

### B. No. 92–SC–394–TG

Billy Joe Griffieth raises five issues on appeal: 1) whether the trial court erred in denying his motion for a directed verdict based on insufficiency of the evidence; 2) whether he was entitled to a mistrial based on witness Hale's "obvious perjury"; 3) whether he was entitled to a mistrial when a testifying officer mentioned his name (or, rather, his initials) in contravention of a court order; 4) whether the court erred in denying Griffieth's request for an instruction on facilitation and other changes in the instructions; 5) whether the prosecutor engaged in prejudicial misconduct by misstating the burden of proof during closing argument.

■ The indictment charged that Griffieth had

committed the offense of First Degree Burglary by unlawfully entering or remaining in the residence of Jerry Layton and Jennifer Layton with the intent to commit a crime therein and while in so doing, or in immediate flight therefrom one or more of the Defendants was armed with a pistol[.]

Griffieth maintains that the Commonwealth's evidence was insufficient to prove the elements of burglary in the first degree beyond

a reasonable doubt, suggesting that, "At most he did nothing more than step in the house in order to open the door for the exiting co-defendants, Hale and Skinner." The appellant argues that the only source of evidence against him was the testimony of Hale, whom he assails for bias and perjury resulting in testimony so contradictory that no reasonable juror could follow or believe it. Bias is alleged due to Hale's plea bargain. The following are cited as examples of Hale's muddled testimony: a) he testified that Golden had fired one shot, and that he had fired several shots; b) he stated that the burglary was his idea, and that it was "everyone's idea"; c) he said that Griffieth had driven the car on the day of the burglary, and also that Madden had driven the car; d) he said that Griffieth had not entered the house, then that Griffieth had merely opened the screen door, and later that Griffieth had stepped inside the house briefly; e) he testified that Griffieth had spoken to the other two men in the house, and later said that Griffieth had said nothing; and f) Hale admitted he was advised as to what to say.

Finding the appellant's citations to the video tape record somewhat inaccurate, we have reviewed Hale's testimony in its entirety. a) Hale's only reference to Golden's shooting is that Golden fired a shot into the air and told them to stop, and then fired another shot. b) According to Hale, all four men discussed, planned and agreed to commit the crime, although it was he who suggested the Layton house as a target. c) Hale testified that the four men left Griffieth's home in the station wagon, Griffieth driving; Hale and Skinner were dropped off at the Layton house; Griffieth later returned to the house on foot across the field; Madden was waiting in the car to pick them up. d) Asked whether he and Skinner were joined by anybody while they were in the house, Hale answered, "Not in the house." Asked a few seconds later if Griffieth came into the house, Hale answered, "Just for a second." Hale then testified that Griffieth stepped back outside and held the screen door open while Hale and Skinner loaded items into the wheelbarrow, which was sitting outside the door. On cross examination, Hale admitted that he had been inconsistent as to whether Griffieth had actu-ally entered the house. On redirect he averred that Griffieth had been inside "just for a few seconds," and that he had made a mistake in his earlier testimony. e) Asked whether Griffieth had said anything to him upon appearing at the house, Hale first shook his head negatively, but then said "He told us . . ." at which point he was interrupted by the next question, "Did he say, 'Come on, let's go'?" Hale answered, "Yes." Challenged on cross examination for a supposed contradiction in the head shaking and the affirmative answer, Hale stated, "I made a mistake." f) Hale testified he had agreed to tell the jury what happened in exchange for the Commonwealth's recommendation to the court in his case. On cross examination, he conceded that he had decided to testify in order to get "a better deal." Asked if it was in his interest to implicate the defendants, he replied, "That's what I was advised to do." Asked if he was advised as to what to testify, he answered, "Some." On redirect examination, Hale explained that he had been advised only to tell the truth, "and that's what I'm doing."

It is clear that Hale's testimony is far from being so contradictory or incredible as to defy understanding or belief by a reasonable juror. The trial court properly reserved to the jury the questions of credibility and the weight to be given to this evidence. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991). We hold that the evidence was sufficient to support a reasonable juror's belief beyond a reasonable doubt that Griffieth had knowingly and unlawfully entered the Layton residence with intent to commit a crime, and that he or another participant had been armed with a deadly weapon while in the building or while in immediate flight therefrom.

The appellant's second contention is that the trial court erred in not granting a mistrial in view of what Griffieth perceives as Hale's incompetent, inconsistent, and perjured testimony. Our preceding discussion sufficiently explains our persuasion that the trial court did not err.

The third issue presented is whether the trial court erred in denying Griffieth's

motion for a mistrial when a police officer, recounting a statement of Skinner's, related that Skinner had spoken of going to "B.J.'s" several hours after the crime. The court had ruled prior to trial that references to Griffieth in such statements must be omitted from evidence, and the officer had been cautioned in that regard. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Having reviewed the officer's testimony, we must conclude that the reference to "B.J." did indeed violate the court's order. We further believe, however, that the reference was inadvertent, and did not constitute an intentional violation by the prosecutor. There was certainly no blatant misconduct such as appeared in *Whitaker v. Commonwealth,* 314 Ky. 303, 234 S.W.2d 971 (1950), cited by the appellant. In *Whitaker,* the prosecutor had deliberately and persistently posed questions which the court had already ruled improper. We further believe, in view of the entire record, and considering that the reference to Griffieth did not impute any criminal activity to him, that the violation here did not prejudice Griffieth's substantial rights, did not affect the outcome of the trial, and was therefore harmless.

Griffieth next contends that the trial court erred in refusing his request for an instruction on criminal facilitation as a lesser-included offense of complicity. KRS 506.080(1) defines criminal facilitation:

A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

KRS 502.020(1) defines complicity:

A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

The principal distinctions between the two offenses are that a) facilitation requires *knowledge* that another intends to commit a crime, while complicity requires an *intention* to promote or facilitate commission of the offense; and b) facilitation requires provision of means or opportunity for commission of the crime, while complicity requires either solicitation, conspiracy, assistance, counsel, etc.

An instruction on a lesser-included offense is appropriate if and only if on the given evidence a reasonable juror could entertain reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense. *Luttrell v. Commonwealth,* Ky., 554 S.W.2d 75 (1977). We begin by noting in the present case that the instruction on burglary in the second degree by complicity was appropriate, in that the jury might well have doubted that Griffieth actually entered the residence, and yet could have believed that he was an active conspirator and participant in the crime. The question then becomes whether the jury might have doubted whether Griffieth intended to promote or facilitate the offense or conspired or aided in its commission, and yet could have believed beyond reasonable doubt that he had knowledge of the others' intention and merely provided them with the means or opportunity for commission of the crime. In view of all the evidence—that Griffieth not only provided the car but drove the car to the scene, returned to the house on foot, held open the door while Skinner and Hale loaded items from the house into the wheelbarrow, and accompanied the two with the wheelbarrow in flight from the house— we believe that a reasonable juror could not have acquitted Griffieth both of burglary in the second degree and burglary by complicity, and still have found him guilty of criminal facilitation. Moreover, even if error occurred in this respect, we are not persuaded

that Griffieth suffered substantial prejudice, considering that he was not convicted of complicity (the "greater offense" of facilitation), but of the primary offense of burglary in the second degree.

■ The latter observation certainly applies to Griffieth's separate complaint that the complicity instruction was unclear, overbroad, and possibly confusing to the jury. Even assuming that this instruction was flawed, there appears no prejudice to Griffieth, who was found guilty under the more stringent instruction on burglary in the second degree.

■ The appellant also maintains that the trial court erred in instructing on first-degree burglary by complicity, arguing that there was no evidence that he knew that any participant in the crime was armed with a deadly weapon. We observe, first, that Griffieth was not convicted under this instruction, but of the lesser offense of burglary in the second degree. Secondly, we find close analogy in the cases of *Commonwealth v. Yeager,* Ky., 599 S.W.2d 458 (1980), and *Ray v. Commonwealth,* Ky., 550 S.W.2d 482 (1977), both of which support the proposition that an accomplice may be held liable for a confederate's aggravated offense, although having no knowledge of the aggravating circumstance.

■ Griffieth's fifth and final contention is that he was unduly prejudiced by certain statements made by the prosecutor during closing argument. The prosecutor told the jury:

> [Y]ou are the judge of the credibility of the witnesses, that is, you all decide what happens based on that testimony—who was telling the truth and to what degree they were telling the truth.

> .    .    .    .    .

> [Y]ou should use your common sense in determining what it is that happened on July 4th of last year.

Griffieth finds in this argument a prejudicial misstatement of the Commonwealth's burden of proof. We do not read in these remarks an attempt to define or diminish the Commonwealth's burden of proof. In any event,

the jury was made fully aware of the Commonwealth's burden both by the court's instructions and by the closing statement of each defendant.

The final judgment and sentence of imprisonment of the Madison Circuit Court is affirmed.

### C. No. 92–SC–395–TG

James Madden raises two issues on appeal: 1) whether the trial court erred in denying his motion for directed verdict based on insufficiency of the evidence; and 2) whether he was entitled to an instruction on criminal facilitation as a lesser-included offense of complicity, and a more favorable instruction on complicity.

■ While there was indeed no evidence placing Madden inside the building, rendering it error to permit conviction for burglary other than by complicity, Madden was in fact convicted of complicity, and therefore the error was harmless beyond any doubt. The evidence was amply sufficient to support conviction of burglary by complicity, i.e., that Madden intended to promote or facilitate the commission of the crime, and, acting on that intention, conspired with or aided the others in planning and/or committing the offense. For example, Hale testified that all four men planned and agreed to commit the crime, that they agreed to split the proceeds equally, that they rode together to the scene, and that—according to the plan—Madden was waiting in the car to pick them up. A number of other witnesses testified that Madden was in the car in the vicinity at the time. Certainly a juror, free to assess the weight and credibility to be given to the evidence, could believe beyond a reasonable doubt that Madden's actions satisfied the elements of complicity under KRS 502.020. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991). Moreover, regardless of whether Madden in fact knew that Skinner was armed, inclusion of an instruction on complicity to burglary in the first degree was not reversible error. *Commonwealth v. Yeager,* Ky., 599 S.W.2d 458 (1980); *Ray v. Commonwealth,* Ky., 550 S.W.2d 482 (1977).

 Like Griffieth (*see supra*), Madden insists that he was entitled to an instruction on criminal facilitation, arguing that the jury might have believed that he was "merely the driver of the car used to transport the others to and from the Layton residence." In view of the evidence, it is our opinion that a juror could not reasonably believe that Madden knowingly provided a means or opportunity for commission of the crime, and nothing more. By accompanying the others to the scene and being "the driver of the car used to transport the others to and from the Layton residence," Madden was an active participant in the crime. Knowledge of the scheme necessarily implies in these circumstances an intention to facilitate the commission of the offense, and clearly demonstrates that Madden aided or attempted to aid the others in committing the offense. We conclude that the trial court did not err in denying the request for an instruction on facilitation.

 Lastly, Madden contends that the instruction under which he was convicted (complicity to second-degree burglary), to which he objected at trial, permitted conviction on grounds not authorized by law. In relevant part, the instruction permitted conviction upon a determination that one or more of the other defendants committed burglary in the second degree and that Madden "aided and assisted the other defendant or defendants in so doing by ... otherwise standing in readiness to aid and assist the other defendant or defendants in the commission of the crime...." Appellant submits that the instruction in this respect was unclear, potentially confusing and overly broad.

Like the appellant, we would prefer that the instruction had been framed in terms of the statute—so far as relevant here, KRS 502.020(1)(b): "Aids, counsels, or attempts to aid such person in planning or committing the offense...." While certainly not exemplary, the trial court's instruction did require a finding beyond reasonable doubt that Madden had "aided and assisted" in commission of the crime. By delineating particular means of aid and assistance, the instruction is arguably less broad than the statutory language. Moreover, unlike the statute, the instruction did not permit—except possibly by inference from the language objected to—conviction upon a finding that Madden had aided or attempted to aid in *planning* the offense. We are not persuaded that the instruction, however irregular, was erroneous, or that the appellant was unfairly prejudiced.

The final judgment and sentence of imprisonment of the Madison Circuit Court is affirmed.

All concur.